[Cite as *State v. Bulger*, 2025-Ohio-373.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 113966 |
| DEON BULGER, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** February 6, 2025

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-17-614706-B

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Frank Romeo Zeleznikar and Anthony Thomas Miranda, Assistant Prosecuting Attorneys, *for appellee.*

Patituce & Associates, LLC, Joseph C. Patituce, and Megan M. Patituce, *for appellant.*

EMANUELLA D. GROVES, P.J.:

{¶ 1} Defendant-appellant, Deon Bulger ("Bulger"), appeals the trial court's rejection of his application for postconviction DNA testing. Upon review, we affirm.

## I.    Facts and Procedural History

{¶ 2} This appeal involves the trial court's rejection of Bulger's postconviction application for DNA testing.  Bulger claims that there is a strong probability that no reasonable factfinder would have found him guilty if an exclusionary DNA result was weighed against "the questionable identifications of unreliable and untruthful witnesses."  With Bulger's argument in mind, we turn to the relevant facts and procedural history.

{¶ 3} This court previously reviewed Bulger's convictions and made the following factual findings:

> This case involves three brothers, Jonathan Menter, Stephen Menter and Jeffrey Menter and their friend, Daniel Wood.  Jonathan was a drug dealer.  On the morning of August 10, 2016, Jonathan met with Christopher Hill, a man to whom he had previously sold marijuana on six or seven occasions. Jonathan and Hill consummated a drug transaction at that time and Hill then introduced Jonathan to a man known by a nickname that began with an "R."  Jonathan made an in-court identification of appellant at trial as the man whom Hill had introduced to him.  Bulger produced a "wad of money" and told Jonathan he would contact him for the purpose of completing another drug transaction.  Jonathan told Bulger to contact him through Hill.
>
> Jonathan had plans to drive to Columbus, Ohio that evening with Stephen, Jeffrey and Wood to attend a concert.  Prior to leaving Cleveland, Jonathan exchanged text messages with Hill setting up the drug transaction that was to be completed before he left for Columbus.  Stephen agreed to drive Jonathan to the location where the drug deal was to take place.  Stephen drove his car with Wood in the passenger seat, Jonathan in the right rear passenger seat and Jeffrey in the left rear passenger seat.
>
> Through text messages, Hill instructed Jonathan to park in the driveway of 17602 Tarkington Avenue near East 176th Street.  When the brothers arrived, they were initially wary because the house at that address appeared to be abandoned but, after exchanging further texts with Hill, Stephen backed his car into the driveway of 17602 Tarkington

Avenue. Shortly thereafter, Bulger and an unidentified black male approached the vehicle. Bulger and Jonathan briefly argued over how to proceed with the transaction during, which Bulger circled the car and leaned into the open driver's side window near Stephen. The unidentified male remained near the front passenger window.

Bulger demanded that Jonathan provide the drugs to him. Stephen told him not to hand Bulger the drugs causing Bulger and his compatriot to draw handguns. Bulger instructed the occupants not to move and pointed his firearm at Stephen. Stephen replied, "you're not going to shoot me" and began to drive. Bulger immediately began shooting at Stephen who was struck twice. One bullet entered Stephen's left upper arm near his left shoulder, crossed through his chest striking both lungs and exited near his right armpit. A second bullet entered Stephen's left back, severed his spine, struck his hepatic vein, liver and diaphra[g]m before exiting his lower right chest. Wood was also struck when a bullet grazed his left leg. Shell casings recovered from the scene indicated that nine shots were fired.

After Stephen was struck by Bulger's gunfire, the car accelerated, out of control, crossed the street, crashed through a garage opposite the address where the drug deal was to occur and traveled into a neighboring backyard before crashing into a tree. Bulger and his accomplice fled the scene. Stephen died from his wounds.

Jonathan and Jeffrey remained on the scene and initially related to police a story about the reason they had come to 17602 Tarkington Avenue. However, after they were informed that Stephen had died, they admitted that they had been present for the purpose of a drug transaction connected to Hill.

Hill provided police with the nickname of "Radio" as the means of identifying the shooter. Homicide investigators learned from a detective in the Gang Impact Unit that the nickname "Radio" corresponded to Bulger. A six-pack photo array was completed and shown separately to Jonathan, Jeffrey and Wood. Jonathan and Wood identified Bulger in the photo arrays as the shooter. Jeffrey selected an unrelated individual with the caveat "if his hair was shorter" but also found Bulger's photo to be familiar if he was "thinner." At trial, all these men identified Bulger as the man who shot Stephen.

The jury found Bulger guilty of aggravated murder, two counts of aggravated robbery, murder and four counts of felonious assault as well

as all of the attached firearm specifications. The jury found Bulger not guilty of three counts of attempted murder and one count of discharge of a firearm on or near prohibited premises. The trial court returned a verdict of guilty on both counts of having weapons while under disability.

At sentencing, the trial court merged both counts of aggravated robbery, two counts of felonious assault and the count of murder into the aggravated murder charge and their attendant firearm specifications as allied offenses. As to the aggravated murder charge, the trial court imposed a prison term of life with the possibility of parole after thirty years to be served consecutive, and subsequent, to the three-year term on the attached firearm specification. The court imposed prison terms of eight years on the remaining felonious assault charges and ordered those counts to be served concurrent to the prison term for aggravated murder. The court ordered the attached three-year firearm specifications on both counts to be served consecutively with the three-year firearm specification attached to the aggravated murder count. Finally, the trial court merged the two counts of having weapons while under disability and imposed a prison term of three years.

*State v. Bulger*, 2018-Ohio-5346, ¶ 3-11 (8th Dist.) ("*Bulger I*").

{¶ 4} Bulger challenged his convictions on multiple fronts in *Bulger I*. Relevant to this appeal, Bulger contested the pretrial identifications made by Jonathan, Jeffery, and Wood. Bulger also claimed that the State failed to present sufficient evidence identifying him as the shooter. Bulger further asserted that his convictions were against the manifest weight of the evidence because eyewitnesses to the event lacked credibility.

{¶ 5} Ultimately, this court overruled Bulger's challenges and affirmed his convictions. *Id*. at ¶ 47. Specifically, we found that Bulger's arguments challenging the pretrial identification procedures were without merit. *Id*. at ¶ 21-24. We also found that the State presented sufficient evidence that he was the shooter, noting:

> [T]he State introduced multiple witnesses that identified Bulger, placed him at the driver's side window and described him shooting the victim. The physical evidence including the paths of the bullets that struck the victim, the location of the shell casings found at the scene and the bullet holes on the driver's side of the vehicle supported this testimony.

*Id.* at ¶ 33. Finally, we disagreed with Bulger's argument that the eyewitnesses to the event lacked credibility. *Id.* at ¶ 38.

{¶ 6} Years later, Bulger filed an application for DNA testing requesting the retesting of two swabs collected from the left rear passenger door of the victim's vehicle and the reswabbing and retesting of nine 9 mm casings. The original testing of the vehicle swabs revealed a partial, inconclusive DNA profile. No human DNA was detected on the casings following initial testing. Amongst his arguments that the statutory requirements for postconviction DNA testing were met, Bulger asserted that prior results were not definitive and advancements in testing could lead to the discovery of new biological material. The State opposed Bulger's application, arguing that Bulger failed to demonstrate that DNA testing would be outcome determinative.

{¶ 7} The trial court denied Bulger's application, finding that he failed to satisfy the statutory requirement that the DNA result would be outcome determinative at the trial stage. The trial court concluded that Bulger's argument, that the discovery of a known felon's DNA profile and his exclusion would amount to strong evidence that the known felon was the true perpetrator, was "illogical and inaccurate" considering the evidence adduced at trial. (Journal Entry, May 14,

2024.)  Specifically, the trial court explained that "[a]t trial, witnesses to the shooting both (a) consistently identified [Bulger] as the shooter; and (b) testified that a second unidentified male was present on the passenger side of the vehicle but was *not* the shooter." (Emphasis in original.) *Id.*  The trial court further noted that there was no testimony that Bulger was on the passenger side of the vehicle or shots were fired from that side of the car.  The trial court emphasized that the jury was best suited to gauge the credibility of the witnesses regarding the identification of the shooter.  Finally, the trial court concluded that "DNA excluding [Bulger] as being on the passenger side or even yielding the identity of the second male outside the car, would do no more than corroborate the testimony elicited at trial."  *Id.*

{¶ 8} Bulger appeals, raising one assignment of error for review.

**Assignment of Error No. 1**

The trial court erred in denying [Bulger's] application for postconviction DNA testing finding a result would not be outcome determinative.

## II.  Law and Analysis

{¶ 9} In his single assignment of error, Bulger argues that exclusionary DNA results would create a strong probability that a reasonable factfinder would not have convicted him.  Bulger claims that such results would generate sufficient doubt about key pieces of evidence, namely the "questionable" and "weak" identifications from "unreliable and untruthful" eyewitness.  We find this claim unpersuasive.

{¶ 10} A trial court's decision regarding whether postconviction DNA testing would be outcome determinative is reviewed for an abuse of discretion on appeal.

*State v. Scott*, 2022-Ohio-4277, ¶ 12, citing *State v. Buehler*, 2007-Ohio-1246, paragraph one of the syllabus, and *State v. White*, 2008-Ohio-1623, ¶ 45. A trial court abuses its discretion when its decision is unreasonable, arbitrary, or unconscionable. *State v. Hill*, 2022-Ohio-4544, ¶ 9, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). Under the abuse-of-discretion standard of review, an appellate court cannot substitute its judgment for that of the trial court. *State v. McFarland*, 2022-Ohio-4638, ¶ 21 (8th Dist.), citing *Vannucci v. Schneider*, 2018-Ohio-1294, ¶ 22 (8th Dist.).

{¶ 11} Eligible offenders may apply for postconviction DNA testing based on the parameters and procedures established in R.C. 2953.71 through 2953.81. R.C. 2953.74(B) describes two circumstances in which a trial court may accept an application for such testing. Relevant to this appeal, R.C. 2953.74(B)(2) provides:

> If an eligible offender submits an application for DNA testing . . ., the court may accept the application only if . . . [t]he offender had a DNA test taken at the trial stage in the case in which the offender was convicted of the offense for which the offender is an eligible offender and is requesting the DNA testing regarding the same biological evidence that the offender seeks to have tested, the test was not a prior definitive DNA test . . ., and the offender shows that DNA exclusion when analyzed in the context of and upon consideration of all available admissible evidence related to the subject offender's case . . . would have been outcome determinative at the trial stage in that case.

Moreover, R.C. 2953.74(C) sets forth six additional requirements, including that the identity of the offender must have been a disputed issue at the trial stage and the hypothetical exclusion result must have been capable of being outcome

determinative. *State v. Riley*, 2024-Ohio-5712, ¶ 12, citing R.C. 2953.74(C)(3)-(5).

R.C. 2953.71(L) defines the phrase "outcome determinative":

> "Outcome determinative" means that had the results of DNA testing of the subject offender been presented at the trial of the subject offender requesting DNA testing and been found relevant and admissible with respect to the felony offense for which the offender is an eligible offender and is requesting the DNA testing, and had those results been analyzed in the context of and upon consideration of all available admissible evidence related to the offender's case . . ., there is a strong probability that no reasonable factfinder would have found the offender guilty of that offense . . . .

{¶ 12} The Ohio Supreme Court has repeatedly explained that this "statutory scheme 'requires the trial court reviewing an application for postconviction DNA testing to presume that an "exclusion result" — that is, a result that "scientifically precludes or forecloses" the offender as a contributor, R.C. 2953.71(G) — will be obtained by the offender.'" *Riley* at ¶ 12, quoting *Scott* at ¶ 11, quoting R.C. 2953.74(C)(4). With that presumption in mind, the trial court must determine whether such a result would be "outcome determinative," asking not whether the available admissible evidence was enough to convict the offender but whether there is a strong probability that no reasonable factfinder would have found the offender guilty of the offenses if a DNA test result excluding the offender had been presented at trial and analyzed in the context of and upon consideration of all available admissible evidence. *Scott* at ¶ 11, 14.

{¶ 13} Here, the trial court determined that a presumed exclusion result would not have been outcome determinative at the trial stage because witnesses to the shooting consistently identified Bulger as the shooter and placed another

unidentified male on the passenger side of the vehicle. The trial court further noted that the testimony offered at trial did not suggest that Bulger was on the passenger-side of the vehicle or that shots were fired from that location. The trial court emphasized the jury's role in gauging witness credibility and concluded that DNA excluding Bulger would merely corroborate their testimony.

{¶ 14} Based on our review of the record before us, we cannot say that the trial court abused its discretion in so finding. In his direct appeal, this court reviewed pretrial identification procedures and evidence produced at trial. We found that the State introduced multiple witnesses that identified Bulger, placed him at the driver's side window, and described him shooting the victim. We further found that the physical evidence supported witness testimony, including the paths of the bullets and location of shell casings and bullet holes. Accordingly, we disagreed that the eyewitnesses to the event lacked credibility. In the context of this evidence and upon its consideration, we cannot say that there is a strong probability that no reasonable factfinder would have found Bulger guilty of the offenses had exclusion results from the left rear passenger door and/or the nine 9 mm casings been presented at trial.

{¶ 15} We note that Bulger relies on *State v. Scott*, 2022-Ohio-4277, to support his argument. There, the Ohio Supreme Court held that the trial court and court of appeals abused their discretion by unreasonably concluding that there was not a strong probability that a reasonable factfinder would have found Scott guilty if a DNA test result excluding Scott had been presented at trial. *Id.* at ¶ 21. While the

evidence underpinning Scott's conviction was based on eyewitness testimony and circumstantial evidence, that case is readily distinguishable. Notably, "significant weight" was given to one eyewitness' testimony; however, that eyewitness later recanted, stating that he purposefully and falsely identified Scott as the offender. *Id*. at ¶ 15. The Ohio Supreme Court found that this witness's recantations, in addition to an exclusion result, would eliminate any remaining credibility to that witness' trial testimony and reduce the weight of other evidence that corroborated it. *Id*. at ¶ 15-16.

{¶ 16} Here, there is no suggestion that any of the eyewitnesses who identified Bulger as the shooter have since recanted. Moreover, as noted by the trial court, an exclusion result with respect to the left rear passenger door would merely corroborate eyewitness testimony. Finally, while an exclusion result with respect to the shell casings would certainly be useful in Bulger's defense, it does not eliminate the eyewitnesses' credibility nor create a strong probability that no reasonable factfinder would have found Bulger guilty in light of their testimony and the physical evidence corroborating it. *See, e.g., State v. Jones*, 2024-Ohio-5935 (7th Dist.) (finding that even if the defendant was excluded as a contributor to touch DNA obtained from shell casings, there was not a strong probability that no reasonable factfinder would have found him not guilty of the charged offenses due to the overwhelming testimony against him); *State v. Reed*, 2024-Ohio-5412 (2d Dist.) (exclusion results from DNA testing of a shell casing would not be outcome determinative considering the other evidence presented at trial). Consequently, we

decline to find that the trial court acted unreasonably, arbitrarily, or unconscionably when it rejected Bulger's application for postconviction DNA testing of these items.

{¶ 17} Finally, we note that the State raises a new jurisdictional argument in its appellate brief, claiming that R.C. 2953.71 through 2953.83 contemplate postconviction DNA testing on "biological material" only. The State argues that because human DNA was not detected on the nine 9 mm casings, they are not "biological material" as defined by statute and fall outside the scope of postconviction applications for DNA testing. As a result, the State asserts that the trial court "never had subject-matter jurisdiction over the non-biological material (shell casings) to order them to be once again tested for the presence of biological material." The State fails to cite any controlling authority in direct support of this argument.

{¶ 18} While the trial court's subject-matter jurisdiction cannot be waived and may be challenged at any time, we need not pass judgment on the issue since the outcome of Bulger's appeal is determined on another basis. Bulger's assignment of error specifically asks us to resolve whether the trial court erred in rejecting his application for postconviction DNA testing based on its finding that results would not be outcome determinative. Because we find that exclusion results would not be outcome determinative and affirm the trial court's rejection of Bulger's application, the State's additional jurisdictional argument is moot. App.R. 12(C).

{¶ 19} Accordingly, Bulger's single assignment of error is overruled.

{¶ 20} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
EMANUELLA D. GROVES, PRESIDING JUDGE

SEAN C. GALLAGHER, J., and
WILLIAM A. KLATT, J.,* CONCUR

(*Sitting by assignment:  William A. Klatt, J., retired, of the Tenth District Court of Appeals.)